## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Lisa Marie McKitrick,                        :               Case No. 5:10-CV-2623

              Plaintiff,                 :

              v.                         :               **MEMORANDUM DECISION
                                                             AND ORDER**

Commissioner of Social Security,             :

              Defendant.                 :

      Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U. S. C. § 1381[1]. Pending are the parties' Briefs on the Merits (Docket Nos. 16 & 20). For the reasons that follow, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND.

      On August 25, 2004, Plaintiff filed an application for SSI alleging that her disability began on March 10, 2003 (Tr. 522-524). The request for an award of benefits was denied initially and upon

---

[1]      Title XVI of the Act provides for payment of SSI benefits to disabled persons who are indigent.  42 U.S.C. § 1382 *et seq*.

reconsideration (Tr. 515-517; 519-521).  Plaintiff filed a timely request for hearing and on August 28, 2008, Administrative Law Judge (ALJ) Kenneth Steward held a hearing at which Plaintiff, represented by counsel, and Glee Ann Kehr, a Vocational Expert (VE), appeared and testified (Tr. 526).  On October 20, 2008, the ALJ rendered an unfavorable decision denying an application for a period of SSI (Tr. 16-23).  On September 22, 2010, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's determination the final decision of the Commissioner (Tr. 5-7).  Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II.  FACTUAL BACKGROUND.

**A.     PLAINTIFF'S TESTIMONY.**

Plaintiff was 26 years of age, she weighed 126 pounds and she was 5'4" tall.  She was married with one child.  Plaintiff was a high school graduate who attempted to attend college but her impairment intervened (Tr. 529, 530, 546).  The Ohio Bureau of Workers' Compensation awarded Plaintiff a lump sum benefit in 2007 (Tr. 531).

Plaintiff was employed at Rite Aid in 2000 and 2001.  After applying for SSI in 2004, Plaintiff attempted to work as a housekeeper.  Her earnings record from Rite Aid and as a housekeeper indicates that neither job constituted substantial gainful activity as defined in the Social Security Act[2] (Tr. 531).

The list of Plaintiff's impairments included anxiety, acid reflux, gastroparesis (a condition that reduces the ability of the stomach to empty its content), hypercholesterolemia, low back pain and migraines (Tr. 535, 538, 539; www.ncbi.nlm.nih.gov).

---

[2]     The Commissioner has defined "substantial gainful activity" at 20 C. F. R. § 404.1572(a).  Substantial gainful activity is work activity that involves doing significant physical or mental activities.  Work may be substantial even if it is done on a part-time basis or if the claimant gets paid less or has less responsibility than when the claimant worked before.  The Commissioner refers to 20 C. F. R. §§ 404.1572 and 404.1574 as a guide to decide whether an individual has done substantial gainful activity.

**Anxiety**.  Plaintiff was hospitalized for an anxiety attack in July 2008.  Although the symptoms of anxiety arose occasionally, the onset of anxiety attacks had been controlled with medication (Tr. 541, 549).

**Acid Reflux**.  The symptoms of acid reflux included difficulty swallowing food that stuck in the back of Plaintiff's throat.  As a result, Plaintiff had a burning sensation in her throat daily.  Plaintiff claimed that she experienced symptoms of nausea and vomiting once weekly.  To relieve her symptoms, Plaintiff was prescribed Methochloride, the side effects of which included dizziness and fatigue (Tr. 538, 539).

**Chest pain**.  In December 2007, Plaintiff began experiencing chest pain.  The condition was traced to the thymus, a primary lymphoid organ located in the superior mediastinum and lower part of the neck that is necessary in early life for the normal development of immunologic function.  In 2008, Plaintiff's thymus was removed.  Since its removal, Plaintiff has suffered from difficulty breathing and anxiety (Tr. 541, STEDMAN'S MEDICAL DICTIONARY 409640, 27th ed. 2000).

**Gastroparesis**.  Plaintiff was treated for chronic constipation, blood in her stomach and an ulcer. When her stomach did not completely empty, Plaintiff experienced nausea and vomiting.  A gastrologist had prescribed medication to relieve the symptoms (Tr. 541-542).

**Hypercholesterolemia**.  The presence of high levels of cholesterol in the blood had resolved lately.  Plaintiff reported that she took Zocor, a medication used to reduce the fatty substances in the blood (Tr. 539; www.nlm.nih.gov).

**Low back pain**.  The sharp, dull pain in her back radiated to her right leg.  Plaintiff described the pain as an eight on a scale of one to ten, with ten being the most severe.  To alleviate pain, Plaintiff took Flexeril.  To improve her posture, Plaintiff wore a back brace.  Percocet, Oxycodone, Vicodin had

been prescribed in addition to epidural injections, physical therapy, water therapy and chiropractic care. None of these therapies were successful in relieving the back pain (Tr. 535, 536).

**Migraines.** To treat the twenty migraines that Plaintiff experienced monthly, Topamax®, an anticonvulsant and migraine prophylaxis, was prescribed. With the onset of a migraine, Plaintiff was incapacitated all day by vomiting, nausea and photophobia. The migraines were resolved by "sleeping it off" or going to the emergency room for an injection of a narcotic analgesic and an anti-inflammatory agent (Tr. 539, 540; PHYSICIANS' DESK REFERENCE, 2006 WL 384462 (Thomson Reuters 2006).

Plaintiff claimed that she could not bend over and pick up anything. She could not stand for more than forty minutes before she felt uncomfortable, had to sit down or her back "locked up" (Tr. 537, 542). Plaintiff claimed that at times she could not climb stairs (Tr. 538). Plaintiff could sit no more than forty minutes before she experienced pain and/or tightness in her leg. Plaintiff did not think that alternating between sitting and standing would resolve the pain or alleviate the discomfort (Tr. 542, 543). Plaintiff estimated that she could lift a maximum of twenty-five pounds because she could not lift her daughter who weighed 37 pounds (Tr. 543, 544).

Plaintiff claimed that she could not work because the onset of her impairments would affect her attendance. For instance, her back was paralyzed often and she had difficulty walking or moving without assistance (Tr. 543). Occasionally, her husband had to dress her. Plaintiff did not drive so she accompanied her husband to the store. So that she did not experience pain, Plaintiff shopped from the lower shelves (Tr. 544). When she washed dishes, Plaintiff pulled a chair up to the sink (Tr. 545).

**B.     VE'S TESTIMONY.**

The VE reviewed the work evaluation report completed by Richard Shea, a counselor at the Canton Rehabilitation Services Commission. Plaintiff had marginal manipulative skills; however, she

was able to answer 86 of the 100 questions correctly related to knowledge of job seeking skills and work behaviors (Tr. 180, 181). Plaintiff's indicated preferences for employment in the areas of business detail, protective and leading/influencing (Tr. 182). It was recommended that Plaintiff participate in job placement services of assistance with development of clerical or related employment in a work environment that would permit her to alternate sitting and standing and to enhance her employability, continue to improve her computer skills in a self-directed study on her home computer (Tr. 185).

The VE noted that Plaintiff's production speed was at an 80 to 85-work rate with a 90 percent quality, which is considered consistent with competitive employment. When required to stay in a set position, Plaintiff's production fell below 85 percent. The VE opined that this requirement suggested a sit/stand option (Tr. 552). The VE defined a sit/stand option as "an individual continuing to do their work whether they're sitting down or standing up as long as they continue to function as I said at the 85 percent work pace, they can do either position" (Tr. 556).

General office clerk jobs that would be available for someone capable of light work and sedentary work with a sit/stand option include:

(1)    Rental Clerk          1,000 residual positions
(2)    Officer Helper        1,100 residual positions
(3)    Information Clerk      1,700 residual positions.

The VE explained that sedentary work allowed for a sit/stand option to some degree. By definition, sedentary work is work where the claimant can sit as much as six hours a day. So if the claimant is standing periodically but still within the two hours, it would still be classified as sedentary work. The most appropriate sedentary positions are:

(1)    Account Clerk         "Reduced number would be approximately 1,200."
(2)    Telephone Clerk       "Reduced number would be approximately 1,000."
(3)    Order Clerk           "Reduced number would be approximately 1,000."

If the claimant were off task more than 15% of the work time or needed several breaks or a break

for an extended period of time, it would preclude employment (Tr. 553-554).

### III. SUMMARY OF MEDICAL EVIDENCE.

On or about February 28, 2003, Plaintiff was working as a housekeeper at the McKinley Grand Hotel. She bent over to clean the floor and heard a pop in her back. She had a sudden onset of low back pain (Tr. 206). On March 10, 2003, Dr. Judson G. Sprandel, II, D. C., a chiropractic physician, performed an x-ray of Plaintiff's lumbar spine. The objective findings of this examination indicated lumbar nerve root irritation and possible disc derangement (Tr. 229).

Results from the magnetic resonance imaging of Plaintiff's lumbar spine, administered on June 16, 2003, showed no evidence of acute fracture, central spinal canal stenosis, but did show evidence of posterior central protrusion type of disc herniation at L5-S1; very early discogenic spondylosis at L5-S1; mild asymmetric disc bulging being slightly more pronounced toward the right side of the disc and apparent backward slippage of one vertebra into the vertebra immediately below (Tr. 222; www//medical-dictionary.thefreedictionary.com/retrolisthesis).

The results from the orthopedic testing conducted by Dr. Sprandel on December 12, 2003, were positive for increased lumbar pain by means of sitting straight leg raise and double leg raise tests. No radiculopathy, a condition due to a compressed nerve in the spine that can cause pain, was noted during testing (Tr. 219; STEDMAN'S MEDICAL DICTIONARY 347610 (27th ed. 2000)).

Plaintiff presented to Dr. Sprandel with mild lumbar stiffness and soreness on February 9, 2004. Orthopedic testing was positive for increased lumbar pain (Tr. 217).

On March 30, 2004, Dr. Sprandel treated Plaintiff's stiffness radiating into the lower extremities. The orthopedic testing was unremarkable for lumbar nerve root irritation; there was no significant limitation of range of motion, and the muscle strength testing of the lower extremities was unremarkable

6

(Tr. 213, 214).

The magnetic resonance imaging of Plaintiff's lumbar spine, administered on May 24, 2004, showed disc herniation at L5-S1 with compression of the thecal sac and early stages of disc degeneration (Tr. 210-211).

On August 9, 2004, Dr. Paul T. Scheatzle, D.O., a physical medicine and rehabilitation practitioner, diagnosed Plaintiff with L5-S1 disc herniation with right S1 intermittent radiculopathy and chronic back pain and lumbar sprain/strain.  He prescribed Bextra, a drug used for relief from pain, fever, swelling and tenderness, for anti-inflammatory and analgesic effect.  Dr. Scheatzle recommended that Plaintiff add "Thera Ball" exercises, postural training and lumbar spine stabilization exercises to her exercise regime (Tr. 208-209; www.healthgrades.com/physician/dr-paul-scheatzle-yfhx7).

From September 14, 2004 through October 8, 2004, Plaintiff underwent a series of work evaluation assessments in which her career profile was completed.  A counselor assessed strengths and limitations and then determined what vocational goals were commensurate with Plaintiff's abilities. Plaintiff's aptitude profile included performance that exceeded the average range in the clerical perception (Tr. 162, 179). Specifically Plaintiff's occupational interest was in organized, clearly defined activities requiring accuracy and attention to details primarily in an office setting.  There were numerous job titles within this occupation that would accommodate her interest and skills (Tr. 163).

Dr. Gary D. Richardson, D. O., an emergency room physician, treated Plaintiff for an upper respiratory infection on April 25, 2005 (Tr. 306).  Plaintiff's sodium level, blood urea nitrogen level, blood count and percentage of concentration of red blood cells in the blood were low (Tr. 308-310; www.mayoclinic.com/health/hematocrit).

Dr. Alice L. Chambly, Psy. D., opined on May 23, 2005, that Plaintiff had a depressive disorder,

not otherwise specified, and borderline intellectual functioning (Tr. 241, 242).  She further opined that Plaintiff suffered from a mild degree of limitation in restriction of activities of daily living; difficulties in maintaining and social functioning and difficulties in maintaining concentration, persistence or pace (Tr. 248).

On June 10, 2005, Plaintiff was diagnosed with benign positional vertigo causing intermittent symptoms such as dizziness (Tr. 275-276).

On October 26, 2005, Plaintiff was brought by squad for back strain in the third trimester of her pregnancy.  An emergency medicine physician, Dr. Mohan Rajaratnam, M. D., administered Morphine through a Heparin lock in Plaintiff's arm(Tr. 253-254).

Dr. Benjamin J. Swisher, a family practitioner, prescribed a transcutaneous electrical nerve stimulation (TENS) unit for pain control system on October 3, 2005 (Tr. 299; www.tensunits.com).

Plaintiff sought emergency treatment for a migraine headache that had persisted for nine days on November 19, 2005.  Plaintiff underwent a series of tests to determine the source of her headaches.  The computed tomography of her head/brain showed no evidence of an acute intracranial hemorrhage mass or midline shift.  The skull study of the right upper temporal showed no abnormalities in the cranial vault or base (Tr. 267, 269, 296, 297).

On November 28, 2005, Dr. Swisher ordered a complete metabolic panel.  The results showed an elevated AST, an enzyme found in high amounts in the heart muscle and liver and muscle cells, and ALT, an enzyme found in the highest amounts in the liver (Tr. 294; www.webmd.com/digestive/alanine0-aminotransferase-alt; www.nlm.nih.gov/medlineplus/ency/article/003472.htm).  These enzymes were out of range again on December 13, 2005.  In addition, Plaintiff's Ferritin levels were out of range.  Ferritin is a protein found inside cells that stores iron so that the body can use it later.  A Ferritin test indirectly measures the

8

amount of iron in one's blood (Tr. 292; www.nlm.nih.gov/medlineplus/article/003490.htm). Dr. Swisher ordered a lipid panel on December 19, 2005.  The results showed a cholesterol level that exceeded the normal range (Tr. 290, 291).

No hemochromatosis mutation, an iron disorder where the body loads too much iron, was detected in blood collected on January 4, 2006 (Tr. 286; www.hemochromatosis.org/hemochromatosis).

Plaintiff had an epidural on January 6, 2006 (Tr. 290A).  On January 8, 2006, Plaintiff presented to the emergency room for treatment of low back pain.  She was prescribed Zanaflex, a medication used to relieve spasms and relax muscles.  Her bun/creatinine ratio was lower than the normal reference range (Tr. 264-266; www.nlm.nih.gov).

Plaintiff presented to the emergency room with rectal bleeding on January 10, 2006.  The attending physician noted a history of migraines.  Again, Plaintiff's bun/creatinine ratio was lower than the normal reference.  The basic metabolic panel was otherwise normal.  She was referred to her gastroenterologist for follow-up care (Tr. 257-263).

Dr. Swisher monitored Plaintiff's use of the TENS unit on March 7, 2006 (Tr. 282).  On April 5, 2006, a therapist at Lifeline Partners, an outpatient rehabilitation facility providing physical therapy and sleep disorder services, and Plaintiff created a physical/occupational therapy plan of care.  At the conclusion of her sessions Plaintiff was able to compete only minimally as her back pain was still severe (Tr. 313-321; http://lifelinepartners.com).

On March 29, 2006, Dr. Swisher ordered a gynecological cytology report.  The results were negative for intraepithelial lesion or malignancy (Tr. 279). On April 6, 2006, Dr. Swisher ordered a transabdominal and transvaginal ultrasound.  The results showed a mildly complex cyst within the right ovary (Tr. 278).

Dr. Edmond W. Gardner, M.D., opined on June 5, 2006 that Plaintiff had no manipulative, postural, communicative and environmental limitations (Tr. 326-327).  In fact, Plaintiff could:

1.  Occasionally lift and/or carry fifty pounds; climb using a ladder/rope/scaffolds; balance; stoop or crawl.
2.  Frequently lift and/or carry twenty-five pounds; climb using a ramp/stairs; balance; kneel or crouch.
3.  Stand and/or walk about six hours in an eight-hour workday.
4.  Sit about six hours in an eight-hour workday.
5.  Push and pull on an unlimited basis, other than as shown for lift and/or carry.

(Tr. 324, 325).

Results from the acute abdominal series with a chest x-ray taken on March 28, 2007, showed a normal gas pattern, no enlargement of internal organs, no skeletal abnormality or soft tissue mass in the abdomen.  The heart, hila (a part of an organ where the nerves and vessels enter and leave), mediastinum (a septum between two parts of an organ or an organ or a cavity) and lungs were all normal (Tr. 487; STEDMAN'S MEDICAL DICTIONARY 243300 (27th ed. 2000).

On March 28, 2007, April 17, 2007 and May 7, 2007, Dr. Lawrence Cohen, M. D., addressed issues of constipation, vomiting and diarrhea.  Dr. Cohen attributed the chronic constipation to colonic inertia, the intake of Morphine and vestiges of Vicodin that remained in her system.  Imodium® and Miralax® were prescribed.  Dr. Cohen recommended that Plaintiff avoid caffeine, alcohol, greasy, fried and fatty foods.  He noted that Plaintiff had a history of migraine headaches (Tr. 371, 375).

In the meantime on April 4, 2007, Plaintiff's glucose level exceeded the normal  range (Tr. 484).  Plaintiff presented to Affinity Medical Center (Affinity) for treatment of a swollen gland on April 5, 2007.  Dr. Gary Richardson, D. O., an emergency room physician, determined that the gland was freely moveable, non-tender and that there were no other lesions (Tr. 482-483).

Dr. James F. King, M. D., a gastroenterologist, performed an esophagogastroduodenoscopy to

10

rule out esophagitis, ulcers or obstruction on April 30, 2007.  Except for gastroparesis and retention, Dr. King found a normal esophagus, stomach and duodenum (Tr. 377).

On June 12, 2007, Dr. Michael Rivera-Weiss, M. D., a pain management physician, commenced Methadone treatment for purposes of relieving chronic lumbar pain (Tr. 481).

Plaintiff presented to Affinity on June 22, 2007, with complaints of swollen glands.  She was diagnosed with left level five disease of the lymph nodes.  It was planned that the mass would be removed (Tr. 381-383).

From a sample collected on June 25, 2007, the level of chloride in Plaintiff's body was out of range.  Her glucose level was within the normal range (Tr. 477).

On July 6, 2007, Plaintiff was diagnosed with left cervical disease of the lymph nodes and a deviated nasal septum and nasal obstruction.  Antibiotics were prescribed for purposes of shrinking any growth (Tr. 389).

On July 10, 2007, Dr. Nabil attributed Plaintiff's constipation to colonic inertia.  Plaintiff had ceased taking Vicodin and Morphine.  He attributed the recurrent nausea, vomiting and early satiety to gastroparesis.  Dr. Nabil also noted that Plaintiff had a history of migraine headaches (Tr. 369).

Plaintiff underwent an excision biopsy of the left posterior cervical lymph node on August 20, 2007 (Tr. 391-394).

A third epidural injection was administered under fluoroscopy guidance on September 6, 2007 at the L4 interspace (Tr. 395).

On September 10, 2007, Plaintiff reported that she was doing better.  Her bowels were moving and she had no difficulty swallowing.  There was no reflux or vomiting.  It was noted that Plaintiff had a history of migraine headaches (Tr. 368).

11

On September 28, 2007, Dr. Mark S. Brigham, D.O., an otolaryngological surgeon, performed a successful tonsillectomy and adenoidectomy (Tr. 400-408).

On November 12, 2007, Plaintiff presented to Affinity with complaints of low back pain.  She was diagnosed with lumbar disc protrusion at L5-S1, lumbar spondylosis and lumbar radiculitis.  Plaintiff was prescribed medication for pain and additional tests were ordered (Tr. 409).

On November 27, 2007, there was no evidence of significant electrodiagnostic abnormalities to indicate any acute ongoing radiculopathy or significant chronic radiculopathy (Tr. 411).

On December 18, 2007, Plaintiff presented to Affinity with complaints of back and right leg pain.  Dr. Scheatzle recommended that Plaintiff continue with the prescribed medication (Tr. 417-418).

On January 16, 2008, Dr. Fahmy diagnosed Plaintiff with chronic constipation, either colonic inertia or dyssenergic defecation, a health condition that results from the experience of chronic constipation, and migraine headaches (Tr. 367; www.ncbi.nlm.nih.gov/pubmed/17131466).  Plaintiff underwent a computed angiography chest with intravenous contrast on January 26, 2008.  There was no evidence of pulmonary embolism (Tr. 359).  On January 27, 2008, Plaintiff was treated for chest pain (Tr. 353-356).

On March 4, 2008, Dr. Shoshone A. Richardson, M. D., conducted tests to ascertain the cause of Plaintiff's chronic chest pain.  The radiological view of Plaintiff's chest showed no acute abnormalities (Tr. 347-352).

Results from the electrocardiogram administered on April 14, 2008 were normal (Tr. 342).

Dr. Antoinios E. Chryssos, M. D., a general surgeon, diagnosed Plaintiff with thymoma, a tumor originating from the epithelial cell of the thymus.  On April 17, 2008, he performed a thymectomy (Tr. 333; www.en.wikipedia.org/wiki/Thymoma; www.healthgrades.com/physician/dr-antonios-chryssos).

X-rays of Plaintiff's chest administered on April 19, 2008, showed no acute pulmonary process. There was, however, bilateral subsegmental loss of lung volume at the lung bases. No evidence of free air and gas in the pleural cavity was observed (Tr. 338, 339, 340; STEDMAN'S MEDICAL DICTIONARY 36120 (27th ed. 2000)).

Dr. Mark T. Tawil, M. D., a thoracic surgeon, made an incision into the sternum to perform a thymectomy on April 17, 2008 (Tr. 454). He examined Plaintiff on May 2, 2008, and determined that her incision from removal of the thymus was healing well. He gave Plaintiff a prescription for Percocet and released her from his care (Tr. 450; www.healthgrades.com/directory/dr-mark-tawil-md).

On May 5, 2008, Plaintiff was treated for mid-sternal chest achiness as a result of the thymus resection. Plaintiff complained of insomnia and "increasing constipation" (Tr. 449).

Dr. Fahmy snared, excised and removed a polyp in the sigmoid colon measuring .5 centimeters on May 12, 2008 (Tr. 365). The samples collected from the polyp showed the presence of a tubular adenoma, a benign neoplasm composed of epithelial tissue resembling a tubular gland (Tr. 365, 446, 448; STEDMAN'S MEDICAL DICTIONARY 7030 (27th ed. 2000)).

Plaintiff complained of low back and mid-chest pain on May 21, 2008. Dr. Rivera-Weiss prescribed water therapy (Tr. 423).

On May 29, 2008, a physical therapist, Paul Renner, conducted a functional capacity evaluation during which he administered a series of activities and measured whether Plaintiff was able to generate measurable responses to each activity. For instance, Plaintiff's score in the Minnesota Two-Hand Manipulation Test, an examination of manual manipulation skills using both hands, placed her in the 54th percentile or average category. This meant that Plaintiff's hand strength and manual dexterity skills were adequate for heavy work tasks. However, based on all of the data and observations, Mr. Renner rated

Plaintiff's physical demand classification in the sedentary category (Tr. 436-438).

On June 4, 2008, Dr. Fahmy treated Plaintiff for symptoms such as frequent heartburn, burning of the throat and reflux, all associated with exacerbated gastrointestinal reflux disease.  Dr. Fahmy also noted that Plaintiff had a sigmoid polyp tubular adenoma by biopsy with internal hemorrhoids and irritable bowel syndrome with constipation (Tr. 362-363).

The results from the pulmonary test which was administered on June 13, 2008, showed that Plaintiff's ability to breathe in and out was normal (Tr. 429-430).

On June 12, 2008, Dr. Daryl Donald, an emergency room physician, conducted a tomographic sectioning through Plaintiff's chest.  The results showed no evidence of acute cardiopulmonary process or pulmonary emboli or detached, itinerant intravascular mass (Tr. 432; STEDMAN'S MEDICAL DICTIONARY 127930 (27th ed. 2000); www.healthgrades.com/Dr-Daryl-Donald-MD)).

Mr. Renner determined May 29, 2008, that Plaintiff could:

1.    Occasionally lift twenty-one pounds and carry 10 pounds, climb stairs, kneel or crouch;
2.    Frequently lift fifteen pounds and carry ten pounds; balance using one foot at a time and stoop, reach, handle, feel and engage in fine and gross manipulation;
3.    Stand/walk 5.5 hours in an eight-hour workday,
4.    Stand twenty minutes without interruption;
5.    Walk twenty minutes without interruption; and
6.    Rarely climb a ladder or crouch.

(Tr. 426).

On June 23, 2008, Dr. Swisher signed the medical source statement, concurring in Mr. Renner's findings (Tr. 427).

14

## IV.  STANDARD FOR DISABILITY.

Eligibility for DIB and SSI is predicated on the existence of a disability.  *Martinez v. Commissioner of Social Security*, 692 F. Supp.2d 822, 825 (N. D. Ohio 2010) (*citing* 42 U.S.C. §§ 423(a), (d)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in DIB context); see also 20 C. F. R. § 416.905(a) (definition used in SSI context)).  The Commissioner's regulations governing the five-step evaluation of disability for DIB and SSI are identical for the purposes of this case, and are found at 20 C. F. R. §§ 404.1520 and 416.920, respectively:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four.  *Id.* (*citing Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.*  The court considers claimant's residual functional capacity, age, education, and past work experience to determine if claimant could perform other work.  *Id.* (*citing Walters*, 127 F.3d at 529.  Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled.  20 C.F.R. § 404.1520(b)-(f); *see also*

*Walters*, 127 F. 3d at

## V.  THE ALJ'S FINDINGS

On October 20, 2008, the ALJ applied the governing five step analyses and determined that Plaintiff was not disabled.  Upon consideration of the evidence, the ALJ made the following findings:

At step one, the ALJ found that Plaintiff had not engaged in substantial work activity as defined at 20 C. F. R. § 404.1572, since March 10, 2003, the application date.

At step two, the ALJ found that Plaintiff had the following severe impairments:  lumbar disc protrusion with spondylolisthesis and radiculitis.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§ 404.1525 and 404.1526).

At step four, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of sedentary work.

At step five, the ALJ found that Plaintiff was 21 years of age, a younger individual age 18-44, with at least a high school education and the ability to communicate in English.  Considering her age, work experience and residual functional capacity, there were jobs in significant numbers in the national economy that Plaintiff could perform.  Consequently, Plaintiff was not under a disability from March 10, 2003 through the date of this decision (Tr. 18-23).

## VI.  STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial

16

evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

17

**VII. DISCUSSION**

In the Brief, Plaintiff identifies three errors in the ALJ's decision.  First, the ALJ erred by failing to consider the diagnoses of migraine headaches and gastroparesis.  Second, the ALJ failed to attribute any weight to Dr. Sprandel's opinions.  Third, the ALJ failed to attribute controlling weight to Dr. Swisher's opinions.

Defendant replied that substantial evidence supported the ALJ's determination that Plaintiff's migraine headaches and gastroparesis were not severe impairments and that substantial evidence supports the ALJ's residual functional capacity finding for sedentary work.  Accordingly, the ALJ''s non-disability finding should be affirmed.

**1.   MIGRAINE HEADACHES AND GASTROPARESIS.**

Plaintiff contends that the symptoms and limitations relevant to migraine headaches and gastroparesis were not fully addressed under the "umbrella" of Plaintiff's severe impairments; therefore, the ALJ's failure to consider migraine headaches and gastroparesis severe impairments constitutes reversible error.

A non-severe impairment is defined by the regulations as one that does not significantly limit the claimant's ability to do basic work activities.  *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 89 -90 (6th Cir. 1985).  Preceded by the obviously necessary determination of whether the claimant is currently working, and followed by either the determination of disability on medical grounds alone (the listing of impairments) or consideration of residual functional capacity in light of the availability of suitable jobs, the second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims.  *Id.*  An overly stringent interpretation of the severity requirement would violate the statutory standard for

18

disability by precluding administrative determination of the crucial statutory question:  whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience.  *Id.*

Social Security regulations require that the ALJ consider the impact of **all** impairments on the claimant's abilities.  20 C. F. R. § 404.1545(a)(2) (Thomson Reuters 2011).  However, Congress has approved the threshold dismissal of claims obviously lacking medical merit, because in such cases the medical evidence demonstrates no reason to consider age, education, and experience.  *Higgs v. Bowen*, 880 F. 2d 860, 863 (6ᵗʰ Cir. 1988) (*citing Bowen v. Yuckert*, 107 S. Ct. 2287, 2294 (1987)).  The Sixth Circuit court has recognized, the severity requirement may still be employed as an administrative convenience to screen out claims that are "totally groundless" solely from a medical standpoint.  *Id.* (*citing Farris*, *supra*, 773 F.2d at 90 n. 1).

Under these standards, the question in the present case is whether there is substantial evidence in the record supporting the ALJ's decision to dismiss Plaintiff's claims that migraines and gastroparesis were severe impairments.  A thorough review of the record shows that Plaintiff was treated for migraine headaches once in November 2005 (Tr. 267, 269, 296, 297).  Thereafter references are made only to Plaintiff's history of migraines (Tr. 257-263, 367, 369, 371-375).  The symptoms of a migraine headache were obviously not prevalent after November 2005.  The ALJ, therefore, was free to dismiss this claim as it lacked medical merit.

Plaintiff was diagnosed on April 30, 2007 with gastroparesis.  In July 2007, it was noted that the episodes of gastroparesis were arising spontaneously or from an unknown cause.  Dr. Cohen noted in September 2007, that gastroparesis was not a current issue.  By June 2008, it was generally noted that Plaintiff had a history of gastroparesis and the symptoms were controlled with Prevacid® and Reglan (Tr.

19

353, 362, 364, 367, 368, 369, 370, 446, 449, 457, 475).  The ALJ was free to dismiss the claim of gastroparesis as there was no evidence that it was a severe impairment that was expected to last for a continuous period of not less than twelve months.

This Court must affirm the Commissioner's conclusions that the migraines and gastroparesis lack medical merit.  Such decision is the result of the application of the correct legal standards and the conclusions are supported by substantial evidence in the record.

### 2.  CHIROPRACTOR'S OPINIONS.

Plaintiff correctly points out that chiropractors are not an acceptable medical source; however, the ALJ should have assigned **some** weight to her treating chiropractor.

Under 20 C. F. R. § 404.1513, only acceptable sources can provide evidence to establish an impairment.  A chiropractor is not an acceptable source of medical evidence.  *Kastner v. Astrue,* 2009 WL 385793, *7 (S. D. Ohio 2009) (*citing* 20 C.F.R. §§ 404.1513; 416.913).  The Commissioner is not required to give controlling weight to a chiropractor's opinion nor is he required to adopt a chiropractor's opinion.  *Id.* (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997); *Lucido v. Commissioner of Social Security,* No. 03-3713, 2005 WL 221528 at * 2 (6th Cir. 2005).  However, the Sixth Circuit indicated following the implementation of Social Security Ruling (SSR) 06-3p, TITLES II AND XVI:  II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL AND NONGOVERNMENTAL AGENCIES, 2006 WL 2329939 (August 9, 2006), that while information from other sources cannot establish the existence of a medically determinable impairment, the information may provide insight into the severity of the impairment and how it affects the individual's ability to function.  *Cruse v. Commissioner of Social Security,* 502 F. 3d 532, 541 (6th Cir. 2007).

20

Opinions from medical sources who are not technically deemed "acceptable medical sources," under the rules, are important and **should** be evaluated on key issues such as impairment severity and functional effects, along with other evidence in the file.  *Id.* (*citing* SSR 06-3p, 2006 WL 2329939 at *4). Further, the rules explain that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence and how well the source explains the opinion.  *Id.* (*citing Martin v. Barnhart*, 470 F. Supp. 2d 1324. 1328-1329 (D. Utah. 2006) (*citing* SSR 06-3p, 2006 WL 2329939 at *5-6).  The adjudicator generally should explain the weight given to opinions from other sources.  *Id.*

Here, the ALJ attributed no weight to the opinions of the chiropractic practitioner.  In arriving at this conclusion, the ALJ claimed that he considered the factors in 20 C. F. R. § 404.1513 and SSR 06-3p, 2006 WL 2329939.  The ALJ discussed the factors relating to the treatment from Dr. Sprandel, a non-acceptable medical source.  This Court must affirm the Commissioner's conclusions about the weight given Dr. Sprandel's opinions as he applied the correct legal standards and made findings of fact that are consistent with the evidence in the record.

### 3.    TREATING PHYSICIAN.

Plaintiff contends that the ALJ did not accord controlling weight to Dr. Swisher's opinion despite indicating that he did.

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices.  *Id.* (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)).  The regulations of the Social Security Administration require the Commissioner

21

to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances. *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729-730 (N. D. Ohio 2005). Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

Likewise, SSR 96-2p, POLICY RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, *2 (July 2, 1996) provides that when a decision is unfavorable, it " must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied*." Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*citing Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999)). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id. at* 544-545 (*citing Halloran v.*

*Barnhart*, 362 F.3d 28, 32-33 (2nd Cir. 2004)).

In the instant case, the ALJ complied with the regulations for review of the treating physician's medical opinions.  Dr. Swisher monitored Plaintiff's use of a TENS unit and the attendant systems that it affected such as measuring levels of iron, lipids and enzymes.  In addition, he treated Plaintiff for a mildly complex gynecological cyst.  As her treating physician, Dr. Swisher had the tools from which to assess the physical restrictions of Plaintiff's impairment.  Dr. Swisher was able to provide a detailed, longitudinal picture of Plaintiff's impairments supported by appropriate diagnostic testing.  The ALJ claimed that Dr. Swisher was an acceptable treating source and that he gave controlling weight to his opinions.  The ALJ's findings are consistent with Dr. Swisher's findings (Tr. 20, 21).  Since the ALJ followed the polices and rules in making a decision that is supported by the evidence, the Magistrate will not disturb the ALJ's decision to attribute controlling weight to the opinions of the treating physician.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 30, 2011

23